UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

SHEILA HOLLOWAY, as Administrator of the
Estate of CASEY HOLLOWAY,

                      Plaintiff,

      -against-

THE CITY OF NEW YORK, DAQUAN ALLEN,
SHANTAE SMITH, JOHN DOE 1, JOHN DOE 2,
JOHN DOE 3, and JOHN DOE 4,

                    Defendants.

-------------------------------------------------------------------X

Docket No.:

**COMPLAINT**

PLAINTIFF DEMANDS TRIAL
BY JURY

      Plaintiff SHEILA HOLLOWAY, as Administrator of the Estate of CASEY

HOLLOWAY, by her attorneys, KELNER & KELNER, ESQS., as and for her Complaint in the

above-captioned matter, hereby alleges as follows upon information and belief:

### Preliminary Statement

      1.      This action arises from the death of Casey Holloway while in custody of the City

of New York.  While housed within a Mental Observation Unit at the Rikers Island Correctional

Facility, he was assaulted and killed by another detainee, Artemio Rosa. The incident took place

due to defendants' flagrant negligence and violations of his constitutional and civil rights.  This

suit seeks to hold them accountable.

### Jurisdiction and Venue

      2.      This action arises from violations of plaintiff's civil and constitutional rights by

the CITY OF NEW YORK, its agents, servants, and/or employees, including, but not limited to

DAQUAN ALLEN, SHANTAE SMITH, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, and

JOHN DOE 4, and from these defendants' negligent acts and/or omissions.

1

3.      This Court has subject matter jurisdiction over plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.  This action arises, *inter alia*, under 42 U.S.C. § 1983 and § 1988, and the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

4.      This Court has supplemental jurisdiction over plaintiff's claims arising under state law, including, but not limited to, for general negligence, because they are so related to the federal claims that they form part of the same case and/or controversy.

5.      A substantial part of the events and/or omissions giving rise to the claims herein occurred in the County of Bronx, State of New York, and venue in the United States District Court for the Southern District of New York is therefore proper.

### Parties

6.      On or about July 9, 2018, decedent CASEY HOLLOWAY died, leaving distributees surviving.

7.      On July 2, 2019, SHEILA HOLLOWAY was appointed as Administrator of the Estate of CASEY HOLLOWAY, by the Order of the Honorable Rita Mella, and is presently acting in said capacity.

8.      At all times herein mentioned, defendant CITY OF NEW YORK was and remains a municipal corporation, duly organized and existing under and by virtue of the laws of the State of New York.

9.      At all times herein mentioned, the New York City Department of Correction was and remains an agency, subdivision, and/or instrumentality of the CITY OF NEW YORK.

10.     At all times herein mentioned, defendant DAQUAN ALLEN (hereinafter "ALLEN") was employed by defendant CITY OF NEW YORK as a member and/or officer of the New York City Department of Correction.

2

11.     At all times herein mentioned, defendant SHANTAE SMITH (hereinafter "SMITH") was employed by defendant CITY OF NEW YORK as a member and/or officer of the New York City Department of Correction.

12.     At all times herein mentioned, defendant SMITH maintained the rank of Captain in the New York City Department of Correction.

13.     At all times herein mentioned, defendant "JOHN DOE 1," a fictitious name, his or her real name being unknown, was employed by defendant CITY OF NEW YORK as a member and/or officer of the New York City Department of Correction.

14.     At all times herein mentioned, defendant "JOHN DOE 2," a fictitious name, his or her real name being unknown, was employed by defendant CITY OF NEW YORK as a member and/or officer of the New York City Department of Correction.

15.     At all times herein mentioned, defendant "JOHN DOE 3," a fictitious name, his or her real name being unknown, was employed by defendant CITY OF NEW YORK as a member and/or officer of the New York City Department of Correction.

16.     At all times herein mentioned, defendant "JOHN DOE 4," a fictitious name, his or her real name being unknown, was employed by defendant CITY OF NEW YORK as a member and/or officer of the New York City Department of Correction.

17.     Plaintiff undertook reasonably diligent efforts to identify officers JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, and JOHN DOE 4, but said information is presently within the sole and exclusive custody of the defendants herein.

## As and For a First Cause of Action for Negligence against defendant CITY OF NEW YORK

18.    On September 18, 2018, plaintiff SHEILA HOLLOWAY duly and timely served a Notice of Claim, in writing, upon the CITY OF NEW YORK.

19.    On January 9, 2019, SHEILA HOLLOWAY appeared for a hearing, pursuant to General Municipal Law §50-h.

20.    On July 30, 2019, following her appointment as the Administrator of the Estate of CASEY HOLLOWAY, SHEILA HOLLOWAY duly and timely served a further Notice of Claim in her capacity as Administrator.

21.    Defendant CITY OF NEW YORK did not demand or hold a further hearing pursuant to General Municipal Law §50-h, and the time allotted to it by law to have done so has now elapsed.

22.    More than thirty days have elapsed since the service of said Notices of Claim upon defendant CITY OF NEW YORK, and its Comptroller has failed, neglected and refused to pay, settle, compromise or adjust the claims of the plaintiff herein.

23.    The instant action has been brought within one year and ninety days from when the claims set forth herein accrued, and all causes of action set forth herein, including for negligence against defendant CITY OF NEW YORK, are timely.

25.    At all times herein mentioned, defendant ALLEN was acting within the scope of his employment with defendant CITY OF NEW YORK.

26.    At all times herein mentioned, defendant SMITH was acting within the scope of his employment with defendant CITY OF NEW YORK.

27.    At all times herein mentioned, defendant JOHN DOE 1 was acting within the scope of his/her employment with defendant CITY OF NEW YORK.

28.    At all times herein mentioned, defendant JOHN DOE 2 was acting within the scope of his/her employment with defendant CITY OF NEW YORK.

29.    At all times herein mentioned, defendant JOHN DOE 3 was acting within the scope of his/her employment with defendant CITY OF NEW YORK.

30.    At all times herein mentioned, defendant JOHN DOE 4 was acting within the scope of his/her employment with defendant CITY OF NEW YORK.

31.    At all times herein mentioned, defendant SMITH was acting under color of law, on behalf of the defendant CITY OF NEW YORK, and with the power and authority vested in him as a consequence thereof.

32.    At all times herein mentioned, defendant ALLEN was acting under color of law, on behalf of the defendant CITY OF NEW YORK, and with the power and authority vested in him as a consequence thereof.

33.    At all times herein mentioned, defendant JOHN DOE 1 was acting under color of law, on behalf of the defendant CITY OF NEW YORK, and with the power and authority vested in him/her as a consequence thereof.

34.    At all times herein mentioned, defendant JOHN DOE 2 was acting under color of law, on behalf of the defendant CITY OF NEW YORK, and with the power and authority vested in him/her as a consequence thereof.

35.    At all times herein mentioned, defendant JOHN DOE 3 was acting under color of law, on behalf of the defendant CITY OF NEW YORK, and with the power and authority vested in him/her as a consequence thereof.

36.     At all times herein mentioned, defendant JOHN DOE 4 was acting under color of law, on behalf of the defendant CITY OF NEW YORK, and with the power and authority vested in him/her as a consequence thereof.

37.     On and prior to July 9, 2018, Casey Holloway was being detained at the Rikers Island Correctional Facility.

38.     On and prior to July 9, 2018, Casey Holloway was being detained at the Rikers Island Correctional Facility, and was within the care, custody, and control of defendant CITY OF NEW YORK, by and through its Department of Correction.

39.     The CITY OF NEW YORK owned, operated, managed, maintained, and controlled the Rikers Island Correctional Facility.

40.      On and prior to July 9, 2018, Casey Holloway was being detained at the Rikers Island Correctional Facility, within the Anna M. Kross Center (AMKC), in the portion thereof designated as Quad Lower 7.

41.     On and prior to July 9, 2018, Artemio Rosa (hereinafter "Rosa") was being detained at the Rikers Island Correctional Facility, and was within the care, custody, and control of the CITY OF NEW YORK, by and through its Department of Correction.

42.     Prior to July 9, 2018, Rosa had been arrested and committed to the custody of the CITY OF NEW YORK.

43.     Prior to July 9, 2018, Rosa had been arrested and committed to the custody of the CITY OF NEW YORK, by and through its Department of Correction.

44.     Between the time he was taken into custody and July 9, 2018, Rosa had engaged in and exhibited a pattern of behavior indicating his dangerousness to others, including, but not limited to, the decedent.

45.     Between the time he was taken into custody and July 9, 2018, Rosa had initiated one or more assaults on other inmates and/or prison staff.

46.     Between the time he was taken into custody and July 9, 2018, Rosa had initiated four or more assaults on other inmates and/or prison staff.

47.     Between the time he was taken into custody and July 9, 2018, Rosa had engaged in violent and/or impulsive conduct, which was known to defendants.

48.     Between the time he was taken into custody and July 9, 2018, use of force had been required to be employed against Rosa in response to his conduct.

49.     Rosa had been arrested more than 30 times before the time of the incident, including under circumstances evincing his dangerousness and impulsiveness.

50.     On and prior to July 9, 2018, defendants knew and/or should have known that Rosa was affiliated with a criminal gang, the Trinitarios.

51.     On and prior to July 9, 2018, defendants knew and/or should have known that Rosa had a history, including predating the aforesaid detention, of mental illness and violent behavior.

52.     On and prior to July 9, 2018, defendants knew and/or should have known that Rosa had a history, including prior to the aforesaid detention, of violent and/or impulsive behavior in the correctional context.

53.     On and prior to July 9, 2018, defendants knew and/or should have known that Rosa posed a risk of harm to other inmates.

54.     On and prior to July 9, 2018, defendants knew and/or should have known that protective measures were necessary to prevent Rosa from injuring other inmates.

55.    Defendant CITY OF NEW YORK failed to sufficiently and/or properly screen Rosa on intake to Rikers Island.

56.    On July 9, 2018, Casey Holloway and Artemio Rosa were housed within a Mental Observation Unit.

57.    Defendant Rosa was not safely housed in such a unit and/or required heightened supervision.

58.    Mental Observation Units like the one in which Rosa and Casey Holloway were housed offer only limited medical care to inmates, lack structured day long programming, and often contain large numbers of inmates supervised by small numbers of correctional personnel.

59.    Defendant CITY OF NEW YORK knew and/or should have known, on and/or prior to July 9, 2018, that Rosa was not safely housed in a location where he was in proximity to and had the opportunity and occasion to attack other inmates, including the decedent, and/or that he required additional mental health treatment, structured programming, and/or supervision to prevent such conduct.

60.    Defendant CITY OF NEW YORK knew and/or should have known that Rosa was not appropriately assigned to a Mental Observation Unit.

61.    Defendant CITY OF NEW YORK should have housed Rosa in a different unit, consistent with its policies and practices and good and accepted standards of care.

62.    Rosa should have received infractions and/or been reassigned to other housing, based on his prior disciplinary history and conduct.

63.    On the date of the subject occurrence, the unit where Casey Holloway and Rosa were housed had limited supervision, which was insufficient to protect decedent from Rosa.

64.     On and prior to July 9, 2018, defendant CITY OF NEW YORK knew and/or should have known that Rosa posed a risk of harm to other inmates, and that he required additional supervision.

65.     Rosa was insufficiently and inattentively supervised within the unit by the CITY OF NEW YORK, its agents, servants, and/or employees.

66.     On July 9, 2018, at approximately 2:30 p.m., Rosa and Casey Holloway were within the unit.

67.     On the date of the occurrence, and prior to the time of the aforesaid attack, Rosa was behaving in an agitated and/or aggressive and/or instigative manner for a prolonged period of time.

68.     On the date of the occurrence, and prior to the time the aforesaid attack, Rosa was behaving in such a manner as should have alerted defendant CITY OF NEW YORK to the need to intercede to prevent the commission of a violent act, including, but not limited to, against Casey Holloway.

69.     The CITY OF NEW YORK, its agents, servants, and/or employees, including, but not limited to, the individually named defendants herein, knew that Rosa was behaving in such a manner and that he posed a threat to the security of other inmates, but negligently failed to intercede or otherwise act.

70.     It was reasonably foreseeable that, absent intervention, Rosa posed a risk of harm to other inmates, including Casey Holloway.

71.     Defendant CITY OF NEW YORK had a common law duty to exercise reasonable care to protect Casey Holloway from harm under these circumstances, and violated that duty.

72.     At the aforesaid time and place, Rosa attacked Casey Holloway, including, but not limited to, by choking him.

73.     Defendant CITY OF NEW YORK, its agents, servants, and/or employees, failed to protect Casey Holloway from the assault.

74.     Defendant CITY OF NEW YORK, its agents, servants, and/or employees, failed to intercede in a timely manner to prevent and/or terminate the assault.

75.     Following the assault, Casey Holloway was not timely provided with medical attention by the CITY OF NEW YORK, its agents, servants, and/or employees.

76.     Following the assault, Casey Holloway lost consciousness.

77.     Casey Holloway died on July 9, 2018, by reason of the injuries suffered in the assault.

78.     By reason of the foregoing occurrence, Casey Holloway was caused to sustain severe injuries, conscious pain and suffering, and fear of impending death, from the time of said occurrence up to the time of his death.

79.     Defendant CITY OF NEW YORK negligently failed to respond and/or properly respond to Mr. Rosa's history of attacks and/or incidents while incarcerated, gang affiliation, and/or other and further factors demonstrating that he posed a risk to others; failed to provide adequate supervision of, and/or security to, mentally ill inmates, including, but not limited to, the decedent at the time and location in question; failed to post a sufficient number of officers and/or other personnel to supervise mentally ill inmates; failed to provide sufficient security; negligently failed to follow its security guidelines; failed to provide training and/or sufficient training to officers for how to supervise mentally ill inmates; negligently trained, hired, and/or retained the corrections officers involved in the subject occurrence; failed to respond to a history

of prior, similar attacks and/or incidents; failed to prevent the assault on the decedent; failed to

timely intervene to protect decedent, either before or during the attack; failed to provide decedent

with prompt and sufficient medical attention; failed to classify Mr. Rosa correctly based on his

prior conduct before the date of the incident; and otherwise was negligent in causing, allowing,

permitting, and failing to stop or respond to the subject occurrence.

80.     Decedent's injuries were proximately caused by the negligence of defendant

CITY OF NEW YORK, its agents, servants, and/or employees.

81.     By reason of the foregoing, plaintiff has been damaged in the sum of TWENTY

MILLION ($20,000,000.00) DOLLARS.

## As and For a Second Cause of Action for Wrongful Death/Negligence Against the CITY OF NEW YORK

82.     Plaintiff repeats, reiterates, and realleges the allegations set forth in paragraphs 1

through 81 as though set forth more fully herein.

83.      As a result of the foregoing, decedent Casey Holloway was caused to suffer

wrongful death.

84.     Decedent's wrongful death was proximately caused by the carelessness,

recklessness, and/or negligence of the CITY OF NEW YORK, it agents, servants, and/or

employees, including, but not limited to, in each and all of the respects set forth above.

85.     By reason of the foregoing and the wrongful death of the plaintiff's decedent,

plaintiff, SHEILA HOLLOWAY, on behalf of herself and any and all other distributees of the

decedent, has been damaged in the sum of TWENTY MILLION ($20,000,000.00) DOLLARS.

**As and For a Third Cause of Action pursuant to 42 U.S.C. §1983 against defendants
SMITH, ALLEN, and JOHN DOES 1-4**

86.    Plaintiff repeats, reiterates, and realleges the allegations set forth in paragraphs 1 through 85 as though set forth more fully herein.

87.    Prison officials have a duty under the United States Constitution to protect prisoners from violence at the hands of other prisoners.

88.    Defendants owed Casey Holloway, as a pretrial detainee, a duty to protect him from violence at the hands of other inmates under the Fifth, Eighth Amendment, and/or Fourteenth Amendments to the United States Constitution, including, but not limited to the Due Process Clause thereof.

89.    Casey Holloway was subjected to a serious deprivation of these rights by Rosa's lethal attack on his person and the failure of defendants SMITH, ALLEN, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, and JOHN DOE 4 to protect him from same.

90.    At the time of the subject occurrence, defendant SMITH had supervisory responsibility concerning Quad Lower 7.

91.    At the time of the subject occurrence, defendant ALLEN had supervisory responsibility concerning Quad Lower 7.

92.    At the time of the subject occurrence, defendants JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, and JOHN DOE 4 had supervisory responsibility concerning Quad Lower 7.

93.    Defendants SMITH, ALLEN, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, and JOHN DOE 4 knew and/or should have known that Rosa posed an unreasonable risk to the health and safety of other inmates in the Mental Observation Unit, including, but not limited to, Casey Holloway.

12

94.     Defendants SMITH, ALLEN, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, and JOHN DOE 4 knew and/or should have known that Rosa had a history of prior behavioral issues while incarcerated, including, but not limited to, incidences of impulsive and/or violent actions.

95.     Defendants SMITH, ALLEN, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, and JOHN DOE 4 knew of Rosa's prior conduct while incarcerated and his prior criminal history, as described more fully above.

96.     Defendants SMITH, ALLEN, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, and JOHN DOE 4, failed to take action prior to the date of the subject occurrence to remove Rosa from the Mental Observation Unit, notwithstanding cause for same.

97.     Defendants SMITH, ALLEN, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, and JOHN DOE 4 failed to place, and/or recommend placement of, Rosa in alternative housing, to minimize the risk he posed to other inmates, notwithstanding cause for same.

98.     Defendants SMITH, ALLEN, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, and JOHN DOE 4 failed to initiate appropriate disciplinary action against Rosa, based on his prior conduct, notwithstanding cause for same, and/or to provide for appropriate additional supervision.

99.     By leaving Rosa in the Mental Observation Unit and/or failing to take appropriate measures to minimize the risk Rosa posed, defendants ignored his prior behavioral history, characteristics, and conduct, and disregarded the safety of inmates, including the decedent.

100.    On July 9, 2018, prior to the time he assaulted Casey Holloway, Rosa had been acting in an agitated, belligerent, and instigative manner.

97.     On July 9, 2018, prior to the time of the assault, Rosa had been acting in a manner that should have indicated and/or did, in fact, indicate that he posed a risk of serious bodily harm to other inmates.

101.     On July 9, 2018, prior to the time he assaulted Casey Holloway, Rosa had been acting in a manner that did alert and/or should have alerted defendants SMITH, ALLEN, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, and JOHN DOE 4, such that they knew and/or should have known that Rosa posed a risk to other inmates in his unit.

102.     Defendants SMITH, ALLEN, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, and/or JOHN DOE 4 affirmatively observed Rosa's conduct, including, but not limited to, his agitated and belligerent state prior to the assault, and failed to intervene to remove him from the vicinity and/or otherwise neutralize the threat he posed to other inmates.

103.     Defendants SMITH, ALLEN, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, and/or JOHN DOE 4, affirmatively and personally observed Rosa's conduct, including, but not limited to, the initiation of the assault and failed to intervene to protect Casey Holloway.

104.     Defendants' failure to intervene prior to the time of the assault, their failure to timely intercede once it commenced, and their failure to provide timely medical care represented violations of Casey Holloway's civil and constitutional rights.

105.     As a result of the foregoing, Casey Holloway was caused to sustain severe, serious, and permanent personal injuries, conscious pain and suffering, and fear of impending death.

106.     Defendants SMITH, ALLEN, HILL, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, and JOHN DOE 4, under color of state law, subjected the decedent to the foregoing acts and omissions in violation of 42 U.S.C. §1983, thereby depriving him of rights, privileges, and

14

immunities secured by the United States Constitution, including the Fifth, Eighth, and Fourteenth Amendments thereto.

107.    By reason of the foregoing, decedent's Estate has sustained damages in the amount of TWENTY MILLION DOLLARS ($20,000,000.00).

108.    Plaintiff further claims punitive damages against each and all of the named defendants herein, in amounts to be assessed by a jury.

109.    Plaintiff further claims attorney's fees, pursuant, inter alia, to 42 U.S.C. §1988.

### As and For a Fourth Cause of Action pursuant to 42 U.S.C. §1983 against defendants SMITH, ALLEN, and JOHN DOES 1-4

110.    Plaintiff repeats, reiterates, and realleges the allegations set forth in paragraphs 1 through 109 as though set forth more fully herein.

111.    Defendants SMITH, ALLEN, HILL, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, and JOHN DOE 4, under color of state law, subjected the decedent to the foregoing acts and omissions in violation of 42 U.S.C. §1983, thereby depriving him of rights, privileges, and immunities secured by the United States Constitution, including the Fifth, Eighth, and Fourteenth Amendments thereto..

112.    As a result of the foregoing, decedent Casey Holloway was caused to suffer wrongful death.

113.    By reason of the foregoing, plaintiff has sustained damages in the amount of TWENTY MILLION DOLLARS ($20,000,000.00).

114.    Plaintiff further claims punitive damages against each and all of the named defendants herein, in amounts to be assessed by a jury.

115.    Plaintiff further claims attorney's fees, pursuant, inter alia, to 42 U.S.C. §1988.

## As and For a Fifth Cause of Action pursuant to 42 U.S.C. §1983 against defendant CITY OF NEW YORK

116.    Plaintiff repeats, reiterates, and realleges the allegations set forth in paragraphs 1 through 115 as though set forth more fully herein.

117.    This incident was proximately caused by the CITY OF NEW YORK's deliberate indifference to the constitutional rights of detainees and/or inmates (jointly referred to, for present purposes, as inmates), particularly those in Mental Observation Units at Rikers Island.

118.    The CITY OF NEW YORK has, for a prolonged period of time, known and recognized that the correctional approach it employs in Mental Observation Units at Rikers Island is insufficient to provide reasonable, constitutionally sufficient protection to inmates and detainees diagnosed with serious mental illnesses from harm while in confinement.

119.    Mental Observation Units typically house large cohorts of inmates, lack significant structured day programming, and provide only for limited supervisory involvement by correctional personnel.  They are also commonly staffed by corrections officers with little and/or no specialized training concerning the supervision of mentally ill inmates.

120.    The CITY OF NEW YORK has long known and recognized that structured, clinically driven approaches for the confinement of mentally ill inmates, staffed by properly trained personnel, lead to better outcomes and safer conditions of confinement than the approach employed in Mental Observation Units.

121.    In fact, it has implemented such an approach for seriously mentally ill inmates who have amassed significant infraction histories.  Seriously mentally ill inmates whose behavioral history would otherwise potentially warrant punitive segregation at Rikers Island are sent to Clinical Alternatives to Punitive Segregation (CAPS) units instead.  CAPS units provide inmates with intensive, therapeutic schedules that include morning meetings, multiple day and

16

evening programs, and one-on-one encounters with a wide range of mental health staff, including counselors, psychologists and psychiatric providers. They are staffed by correctional personnel with specialized training as to how to supervise the mentally ill.

122.    By employing this approach, CAPS units have brought about a decrease in inmate involvement in Use of Force incidents by 43% and a decrease in assaults on staff of 72%. Inmate injury and violence rates are also significantly lower in CAPS units, even as compared with Restrictive Housing Units, where infracted inmates otherwise are sent.

123.    There are also published studies that demonstrate the safety benefits of the approach employed in CAPS units.[1]

124.    In testimony before the New York State Assembly in November of 2014, Dr. Homer Venters, formerly the Chief Medical Officer for the City's jails, explained that CAPS units had "very low rates of incidents" because they rely on positive incentives to improve behavior; rely on staff members who had been trained together, and who do not rotate out of the unit, and thereby improved cohesion and the quality of supervision; and other techniques appropriate to the circumstances of mentally ill inmates.

125.    Prior to the year 2015, the CITY OF NEW YORK knew that the clinical and programmatic approaches employed in CAPS units would similarly benefit the safety and security of inmates in Mental Observation Units.  It failed to act meaningfully on that knowledge.

---

[1] *See, e.g.,* Sarah Glowa-Kollish, Fatos Kaba, Anthony Waters, Y. Jude Leung, Elizabeth Ford, and Homer Venters, "From Punishment to Treatment:  The 'Clinical Alternative to Punitive Segregation' (CAPS) Program in New York City Jails," INT. J. ENVIRON. RES. PUBLIC HEALTH (February 13, 2016), 182.  All footnoted documents and articles are respectfully incorporated herein by reference.

126.   Defendant CITY OF NEW YORK recognized the insufficiency and lack of safety of Mental Observation Units, and that the clinically driven approach employed in CAPS units for inmates who would otherwise be in punitive segregation needed to be extended to seriously mentally ill inmates in Mental Observation Units.

127.   In January 2015, based on its knowledge of the increased safety, security, and other and further benefits of greater clinical and programmatic treatment for mentally ill inmates, the City created several "Program to Accelerate Clinical Effectiveness" (PACE) units.

128.   PACE units housed inmates who otherwise would be in Mental Observation Units.

129.   When the City created PACE units in 2015, it did not create enough of them to house any significant part of the seriously mentally ill inmate population at Rikers.  The PACE units it created accommodated only an exceedingly small number of inmates, with the remainder of the inmates remaining in Mental Observation Units.

130.   Defendant CITY OF NEW YORK, prior to the time of the aforesaid occurrence, recognized the necessity to implement greater clinical care, greater staff training, additional day programming, and other and further methodologies to protect inmates in Mental Observation Units, but failed to do so.

131.   The few PACE units the CITY OF NEW YORK did create apply many of the techniques that were already applied with success in CAPS units.

132.   PACE units encourage and facilitate inmates' adherence to treatment, including medication, and jail rules.

133.   PACE units provide greater programming, treatment, and supervision for seriously mentally ill inmates.

134.    PACE units are staffed by corrections personnel who have received meaningful specialized training with regard to the supervision of mentally ill inmates.

135.    In all these respects, PACE units differ from Mental Observation Units.

136.    The CITY OF NEW YORK knew and recognized, before the time of the subject occurrence, that PACE units, and/or certain of the techniques employed in PACE units, lead to marked improvements in safety and security for inmates.

137.    There has been a 69% decrease in inmate involvement in Use of Force incidents and a 72% decrease in assaults in staff in PACE units, and decreases in rates of violence and injury among inmates.

138.    In 2016, the CITY OF NEW YORK announced that, based on the increased safety, security, and improved conditions of confinement that are realized from offering clinically driven supervision to mentally ill inmates, it would widely expand the use of PACE units to provide greater protection and care to its inmates.

139.    In 2016, Mayor Bill de Blasio touted the benefits of PACE units and of providing more intensive mental health coverage to seriously mentally ill inmates, stating that a planned expansion of PACE units – which has not yet been realized, even to date – would "help us improve the health and safety of those in Department of Correction custody."[2]

140.    Despite this professed recognition, in the years between the time of the announcement and Casey Holloway's death, the CITY OF NEW YORK implemented scarcely any new PACE units, and elected to leave nearly all of the seriously mentally ill inmates in its charge in Mental Observation Units.

---

[2] *See* City of New York Press Release "Mayor de Blasio to Triple Intensive-Care Mental Health Units on Rikers Island," April 26, 2016, *accessible at* https://www1.nyc.gov/office-of-the-mayor/news/394-16/mayor-de-blasio-triple-intensive-care-mental-health-units-rikers-island (last accessed September 5, 2019).

141.    In addition to failing to implement the additional PACE units to any substantial degree, the CITY OF NEW YORK also failed to apply the data in its possession to improve the safety of the existing Mental Observation Units; it merely left these units, in purpose and effect, to function in the same manner, configuration, and structure as before, despite its knowledge that other and further methods and techniques, even if implemented partially, would lead to safer, more secure conditions for mentally ill persons in confinement.

142.    The CITY OF NEW YORK was capable of applying many of the techniques which were successful in CAPS units to Mental Observation Units, even prior to creating new, functioning PACE units, and failed to do so.

143.    The CITY OF NEW YORK knew that Mental Observation Units were unreasonably dangerous; knew that additional clinical and programmatic changes would remedy the deficiency; and failed to act in any meaningful way on that knowledge, for the span of years.

144.    The CITY OF NEW YORK was deliberately indifferent to the constitutional rights and safety of the inmates it left in Mental Observation Units that it knew were unnecessarily dangerous, and which it nonetheless failed to improve.

145.    The CITY OF NEW YORK's failure to improve the Mental Observation Units at Rikers Island, and the role of this failure in Casey Holloway's death, have been publicly acknowledged and recognized.

146.    A member of the Board of Correction stated to a media outlet: "I am very concerned about delays in the opening of the [PACE] units." He continued: "Delays in setting

up these units have real consequences for people in custody and staff," proceeding to point to Casey Holloway's death as an example.[3]

147.    Elias Husamudeen, the president of the Corrections Officers Benevolent Association union, made statements to similar effect. Referring to Artemio Rosa, he stated: "[Bellevue Hospital's Psychiatric Ward] is probably where he should've been since the beginning…The New York state jails, Rikers Island included, have become a dumping ground for the mentally ill. The blood of [Casey Holloway's] death is on the hands of the mayor and the commissioner of the Department of Mental Health and Hygiene because they're doing absolutely nothing to safeguard the life of correction officers and the life of other inmates."[4]

148.    Mr. Husamudeen, in the same interview with the Post, proceeded to claim that "Rosa could not be placed in protective custody and was allowed to be jailed in general population at Rikers because of a policy implemented by Mayor de Blasio in October 2016 that eliminated punitive segregation for inmates suffering from mental illness." In response, the CITY OF NEW YORK stated through a spokesperson that, despite Rosa's behavioral history, "there was nothing requiring him to be segregated."[5]

149.    The CITY OF NEW YORK's neglect in failing to improve the conditions of Mental Observation Units was particularly problematic given the broader safety deficiencies it caused, allowed, and permitted to exist at Rikers Island, and which further evidenced its deliberate indifference to the safety of inmates, including, but not limited to, those who were

---

[3] *See* Reuven Blau and Rosa Goldensohn, "City Scrambles to Open Special Units for Mentally Ill Inmates," The City, April 10, 2019, *accessible at* https://thecity.nyc/2019/04/new-special-jail-units-for-mentally-ill-are-off-pace.html (last accessed September 5, 2019).
[4] *See* Gabrielle Fonrouge and Stephanie Pagones, "Psycho charged with murdering fellow inmate has history of terrorizing others," New York Post, July 19, 2018, *accessible at* https://nypost.com/2018/07/19/psycho-charged-with-murdering-fellow-inmate-has-history-of-terrorizing-others (last accessed September 5, 2019).
[5] *See id.*.

mentally ill and housed at AMKC. The CITY OF NEW YORK knew the extreme dangerousness of the circumstances it was failing to remedy.

150.     In January 2019, the New York City Board of Correction released a report entitled "Serious Injury Reports in NYC Jails."[6]

151.     As the report detailed, Rikers Island has suffered from an epidemic of violence. The report found that, from "2008 through 2017, despite a 32% decline in the DOC population, the number of Injury to Inmate Reports...generated by DOC for people in custody increased 101%" during that time span.

152.     The report found that the DOC was underreporting serious injuries by inmates and that, in fact, many serious injuries suffered by inmates were never reported at all.

153.     The report found that the DOC's "investigation process for injuries is plagued by delays, poor accountability, and incomplete reviews."

154.     The report found that AMKC was the most dangerous location in which an inmate could be housed. More than one-third of all serious injuries systemwide occurred to inmates of AMKC.

155.     The report found that AMKC had the highest monthly rate of serious injuries per inmate systemwide.

156.     The report found that 83% of inmate injuries took place in housing areas, such as where Casey Holloway was attacked.

157.     The United States Department of Justice has found that the Department of Correction's practices violate the constitutional rights of inmates at Rikers Island. While the report issued documenting its findings pertained most directly to adolescent inmates, it also

---

[6] Available at https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/2019.01.07%20-%20BOC%20Serious%20Injury%20Report%20-%20Final.pdf (last accessed September 5, 2019).

documented systemic deficiencies that are equally applicable to the CITY OF NEW YORK's

failures relating to adult inmates.[7]

158.    The systemic deficiencies included inadequate supervision of inmates by staff,

failures to address violence against inmates, and inadequate training for staff.

159.    The report also documented that inexperienced officers were assigned to

supervise adolescent inmates, which was a posting that required specialized expertise and posed

heightened challenges, and that it was improper not to assign more experienced officers equipped

to navigate these challenges.

160.    The CITY OF NEW YORK repeated its practice of assigning inexperienced

officers to difficult postings with its staffing of Mental Observation Units.

161.    The officers who were assigned to Quad Lower 7 on the date of this occurrence

all had limited experience in their positions.

162.    Defendant SMITH had been a captain for less than a year before the date of the

assault.

163.    Defendant ALLEN had been an officer with the Department of Correction for

only approximately a year before the date of the assault.

164.    Another officer involved in this incident, defendant JOHN DOE 1, had been an

officer for only approximately two years before the date of the assault.

165.    This practice of assigning inexperienced officers to Mental Observation Units was

commonplace, and the CITY OF NEW YORK's persistence in doing so further reflects its

deliberate indifference to the safety of seriously mentally ill inmates.

---

[7] Available at https://www.justice.gov/sites/default/files/usao-sdny/legacy/2015/03/25/SDNY%20Rikers%20Report.pdf (last accessed September 5, 2019).

166.    The practice of assigning inexperienced officers to Mental Observation Units further undermined the safety of inmates.

167.    The need for specialized training of corrections officers in techniques and procedures to supervise seriously mentally ill inmates was obvious; in fact, one of the cornerstones of the PACE program was the provision of additional training to equip officers to supervise the mentally ill. The CITY OF NEW YORK knew, to a moral certainty, that officers supervising these units would face instances where mentally ill inmates would require heightened supervision and expertise to prevent assaults or other injuries.

168.    It was equally obvious that the failure to provide such training and/or to institute such procedures would inevitably result in the greater occurrence of assaults and other kinds of incidents, as corrections officers lacking the requisite training are substantially less equipped to prevent them from transpiring.

169.    Defendant CITY OF NEW YORK was deliberately indifferent to the need for such training and/or monitoring, and to the constitutional rights such training and monitoring were necessary to protect.

170.    The CITY OF NEW YORK knew that inmates in Mental Observation Units at Rikers Island faced substantial risks of harm, including from violence by other inmates.

171.    Mentally ill inmates in Quad Lower 7 on the date of the subject occurrence were subjected to a substantial and unreasonable risk of bodily harm, in violation of their rights under the United States Constitution.

172.    The CITY OF NEW YORK affirmatively knew of measures it could realistically implement which would ameliorate these risks to seriously mentally ill inmates, and failed to do so.

173.   The CITY OF NEW YORK's deliberate indifference to the safety of inmates in Mental Observation Units at Rikers Island, and their rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, proximately caused the subject occurrence and decedent's injuries and death.

174.   By reason of the foregoing, defendant CITY OF NEW YORK, under color of state law, subjected the decedent to the foregoing acts and omissions in violation of 42 U.S.C. §1983, thereby depriving him of rights, privileges, and immunities guaranteed to him by the United States Constitution.

175.   By reason of the foregoing, decedent's Estate has sustained damages in the amount of TWENTY MILLION DOLLARS ($20,000,000.00).

176.   Plaintiff further claims attorney's fees, pursuant, inter alia, to 42 U.S.C. §1988.

## As and For a Sixth Cause of Action pursuant to 42 U.S.C. §1983 against defendant CITY OF NEW YORK

177.   Plaintiff repeats, reiterates, and realleges the allegations set forth in paragraphs 1 through 176 as though set forth more fully herein.

178.   Defendant CITY OF NEW YORK, under color of state law, subjected the decedent to the foregoing acts and omissions in violation of 42 U.S.C. §1983, thereby depriving him of rights, privileges, and immunities guaranteed to him by the United States Constitution.

179.   As a result of the foregoing, decedent Casey Holloway was caused to suffer wrongful death.

180.   By reason of the foregoing, plaintiff has sustained damages in the amount of TWENTY MILLION DOLLARS ($20,000,000.00).

181.   Plaintiff further claims attorney's fees, pursuant, inter alia, to 42 U.S.C. §1988.

## Conclusion

WHEREFORE, plaintiff demands judgment against defendant CITY OF NEW YORK in the sum of TWENTY MILLION DOLLARS ($20,000,000); against defendants SMITH, ALLEN, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, and JOHN DOE 4, in the sum of TWENTY MILLION DOLLARS ($20,000,000); punitive damages against the individual defendants herein; attorney's fees, pursuant to 42 U.S.C. §1988; the costs and disbursements herein; and such other and further relief as the Court may deem just and proper under the circumstances.

Dated: New York, New York
        September 6, 2019

                        Yours, etc.,

                        KELNER & KELNER, ESQS.
                        *Attorneys for Plaintiff*

                        By:_____
                             Joshua D. Kelner (JK-3303)
                        140 Broadway, 37th Floor
                        New York, New York 10005
                        (212) 425-0700